United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>LECONTE ONEAL,<br><br>  Defendant.<br>                                                                     / | No. CR 10-00275 WHA<br><br>**ORDER DENYING<br>MOTION TO SUPPRESS** |

## INTRODUCTION

In this prosecution for possession with intent to distribute cocaine base, defendant Leconte Oneal moves to suppress all evidence found in his hotel room on March 30, 2010, on the ground that the search and seizure violated the Fourth Amendment. This order finds that the police did have the probable cause necessary to merit a warrantless search of Room 310 at the Windsor Hotel because they had sufficient information that it was defendant's residence. Defendant's motion to suppress is **DENIED**.

## STATEMENT

The five officers who took part in this search are all members of the Fugitive Recovery Enforcement Team of the San Francisco Police Department. One of their primary duties was to conduct searches of individuals on probation or parole. At an evidentiary hearing on the motion on September 1, 2010, three of the five officers testified: Officer Roselo Pascua, Officer Alicia Castillo, and Sergeant Stephen Benzinger. Post-hearing briefing was also considered.

1    In the week before March 30, 2010, San Francisco police arrested a confidential informant on a probation-violation warrant (Dkt. No. 38 at 6–7, 64). When arrested, the CI asked Officer Pascua if he/she could provide information about other criminal activity in exchange for lenience. After Officer Pascua explained that he would *not* offer lenience, the CI nonetheless told Officer Pascua that Leconte Oneal, referring to him by name, was selling crack in Room 310 of the Windsor Hotel on Sixth Street, that Oneal was an African-American male born in 1973, and that he possibly had a gun in the room. Nothing was given to the CI in exchange for this information (*id.* at 7–9). Officer Pascua knew that the CI had at least seven prior drug convictions and "scores" of parole and probation violations (*id.* at 47–48).

According to Officer Pascua's testimony, the CI indicated that the Windsor Hotel in which defendant was living was the Windsor Hotel on Sixth Street near the corner of Market Street. There is another "Windsor Hotel" in the Tenderloin but not as close as the one searched (*id.* at 49–53). The officers did not check the other Windsor Hotel to see if it had a Room 310 (*id.* at 54). The Windsor Hotel that *was* searched was a single-resident occupancy hotel on Sixth Street between Market and Mission Streets, in a high-crime area of San Francisco, and the officers involved in the search on March 30 had been there many times in performance of their duties (*id.* at 11–12, 66–67, 91–92). This is a side-show issue. The officers acted reasonably in going to the hotel they visited.

On the morning of March 30, Officers Pascua and Castillo verified that defendant was on felony probation with a warrantless search condition. More specifically, a condition of defendant's probation was that his residence could be searched without a warrant by any officer with a reasonable suspicion that he was violating his probation (Gov. Exh. 3). Mr. Oneal had been most recently arrested by state authorities in October 2009 on drug charges and a disposition was reached in February 2010 (Dkt. No. 38 at 41).

Aware of the information provided by the confidential informant, and aware that Leconte Oneal was on probation and that a term of his probation allowed warrantless search of his residence, the five FRET officers went to the Windsor Hotel to try to locate defendant and search his room (*id.* at 10, 65–66, 90–93). Upon arrival, the officers got the registration card to Room

2

310 from the desk clerk (*id.* at 70, 93–94). It indicated that the room had been rented for the past three months to a "Marcus Howard"; it also listed a birthday of September 21, 1973, a phone number beginning with a 510 area code, and a social security number. The officers compared the information on the hotel registration card to defendant's rap sheet, which they had brought with them to the hotel (*id.* at 73–74). The similarities between the rap sheet and the registration card were that both listed the same birth date, the social security numbers were not the same but had six out of nine digits the same, and both listed telephone numbers with 510 area codes, indicating they are based in the East Bay (*id.* at 73, 97). The differences were that three of the nine social security numbers were different, the phone numbers were not the same, and the name on the registration card was "Marcus Howard," whereas defendant's name is Leconte Oneal.

       The officers ran a search of the social security number that they interpreted as the number listed on the registration card "on the air" from the hotel to see if that number returned an arrest or other involvement with law enforcement (*id.* at 15–16, 74, 97). Nothing came back from the search. This meant either that there was no criminal record or that "Marcus Howard" was a fake name with a fake social security number (*see id.* at 15–16, 97). The officers then asked the clerk to identify a picture the officers had of Mr. Oneal but the clerk was unable to do so (*id.* at 74, 116).

       Based on the information that they had, the officers believed that defendant was living in Room 310, so they decided to search the room (*id.* at 17–18, 96–97, 99). They took the key to Room 310 from the front desk, proceeded to the room, and knocked, but no one responded (*id.* at 18, 74–75). The officers entered the room, discovered there was no one inside, and proceeded to search the room. In the pocket of a pair of jeans in the closet the officers found suspected cocaine base (*id.* at 18, 97).

       Officer Castillo was one of the five officers who took part in these actions on March 30, 2010. She was familiar with Mr. Oneal prior to the day of the search in question because she had arrested him in 2008 (*id.* at 58–64). Though the timing of the following is in dispute, Sergeant Benzinger sent Officers Castillo and Weyl outside to wait for the defendant (*id.* at 75–76, 97–98). It is not exactly clear how long the officers waited for Mr. Oneal to appear on Sixth Street:

1  Officer Pascua stated that it was 20 to 30 minutes between when the officers entered Room 310 to
2  conduct their search and when the defendant was arrested (*id.* at 19); Officer Castillo stated that it
3  was 40 minutes to an hour that she waited outside for the defendant (*id.* at 76); Sergeant
4  Benzinger stated that it was about an hour between when the room was searched and when the
5  defendant was arrested (*id.* at 98).

6  When the officers spotted the defendant on Sixth Street, a warrantless search was
7  conducted of his person (*id.* at 76–77, 98). In his pockets, the officers found a key to Room 310
8  at the Windsor Hotel and a cell phone (*id.* at 77–79, 98). Before the officers left with Mr. Oneal,
9  one of the owners of the Windsor Hotel, a different person from the clerk at the front desk when
10 the officers arrived, identified defendant as the person who was living in Room 310 (*id.* at 20).
11 Mr. Oneal was arrested for possession of the cocaine base found in the searched room and
12 charged with possession with intent to distribute cocaine base.

### ANALYSIS

14 Defendant claims that his Fourth Amendment rights were violated when the officers
15 searched his hotel room without knowledge that it was his residence. The Fourth Amendment
16 allows officers to search the residence of a probationer without a warrant upon reasonable
17 suspicion of a probation violation. *United States v. Knights*, 534 U.S. 112, 121–22 (2001). *But*
18 *the police must also have probable cause that the place they are searching is the residence of the*
19 *probationer. United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010). "The Government
20 bears the burden of showing that a warrantless seizure did not violate the Fourth Amendment."
21 *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).

   **1.   REASONABLE SUSPICION OF PROBATION VIOLATION**

23 A court granting probation may impose reasonable conditions that deprive the offender of
24 some freedoms enjoyed by law-abiding citizens. One of the conditions of defendant's probation
25 was that he was subject to warrantless searches. The Fourth Amendment allows officers to search
26 a probationer's residence without a warrant upon reasonable suspicion of a probation violation.
27 *Knights*, 534 U.S. at 121–22. A confidential informant told the officers that Leconte Oneal was
28 residing in Room 310 of the Windsor Hotel, that he was selling crack, and that he possibly had a

gun in the room. Though defendant argues that the confidential informant was not a reliable source of information and hence reasonable suspicion did not exist, such a tip even from an "untested" informant is sufficiently reliable to amount to a reasonable suspicion that defendant was violating his probation. *See United States v. Rowland*, 464 F.3d 899, 907–08 (9th Cir. 2006). The FRET officers had at least a reasonable suspicion that defendant was in violation of his probation on March 30, 2010.

The inquiry does not end here, however. The government must show that the officers had *probable cause*, not just reasonable suspicion, to believe that Room 310 at the Windsor Hotel was defendant's residence, or that the officers would have inevitably discovered the cocaine base in that room, after waiting for and arresting defendant before any search was conducted.

### 2. PROBABLE CAUSE THAT ROOM 310 WAS DEFENDANT'S RESIDENCE

"[B]efore conducting a warrantless search [of a residence] pursuant to a [probation] condition, law enforcement officers must have probable cause to believe that the [probationer] is a resident of the house to be searched." *Franklin*, 603 F.3d at 656 (citation omitted). Motel rooms can serve as a residence even though the occupancy is temporary in nature. *Id*. at 656–57. A tip from an untested informant may amount to probable cause if it is reliable, which can be established from "consider[ing] the underlying circumstances, including those portions of the information verified by the police, and other factors supporting the informant's reliability and the probable truthfulness of the information given." *United States v. Jackson*, 544 F.2d 407, 410–11 (9th Cir. 1976).

Defendant argues that the informant's tip was unreliable because the informant had seven prior convictions and "scores" of parole and probation violations. It was, however, not *necessarily* unreliable given that the CI's previous drug convictions indicated that he/she was knowledgeable about who sells crack, which made his/her tip more reliable. On the other hand, an untested habitual crack-user and criminal might have said anything, including falsehoods.

One way of confirming the reliability of an informant's statements would have been to consider the basis of that individual's knowledge, as well as by considering his or her motivations. *See United States v. Patayan Soriano*, 361 F.3d 494, 505–07 (9th Cir. 2004). But

5

the government has not provided evidence concerning the basis of the confidential informant's knowledge, apart from the fact that he/she was a crack user generally, or how that was communicated to the officers. As for motivation, once the officers refused to make a deal, there was no incentive to provide truthful information in return. Thus, this order finds that the informant's tip was not reliable on the basis of his/her knowledge or motive. That the parties predominantly discuss the extent to which the tip was *corroborated* shows that counsel implicitly agree. Probable cause turned on whether or not the tip was sufficiently corroborated.

As a preliminary matter, defense counsel points out that there were two Windsor Hotels in the general area of the Windsor Hotel that was searched. But the one searched was the one most consistent with the CI's description that defendant was living at the Windsor Hotel on Sixth Street near the corner of Market Street. Of the two Windsor Hotels, the one searched is the only one on Sixth Street near the corner of Market Street.

In passing, the government states that the fact that before the officers left the station on the morning of March 30 they had information about the defendant's criminal history "lent credibility to the assertion that he was dealing drugs . . . [and] that he might have a gun." How so? It did not corroborate any statements of the CI. It did not provide any independent cause to believe Mr. Oneal was dealing drugs or had a gun *on March 30*. Just because Mr. Oneal was a criminal did not mean that any statement that he was committing a new crime was therefore credible.

Again, the main issue concerns Room 310 and whether there was sufficient corroboration of the tip that Leconte Oneal was living in Room 310. The registration card was submitted as an exhibit to the defendant's motion, and has been referenced by the parties throughout their briefing and at the evidentiary hearing. The government asserts five items of information found thereon provided sufficient support to the reliability of the informant's tip to create probable cause.

*First*, three digits of the social security number listed on the registration card varied from the social security number listed on defendant's rap sheet but the rest were identical. The government argues that the similarity of the social security numbers helped create probable cause. Although it is true that the social security numbers were "similar" insofar as they shared all but three digits, there are several reasons why this similarity, such as it is, did not add to the

6

reliability of the confidential informant's tip. According to the Social Security Administration, the first three numbers of a social security number indicate one's state of residence when applying for that number. *See* http://ssa-custhelp.ssa.gov/app/answers/detail/a_id/248/~/meaning-of-the-numbers-in-your-social-security-number. The government does not provide authority to the contrary. The overlapping digits were the first three, fourth, seventh, and ninth digits. Therefore, of the six overlapping digits, three indicate the state of residence and are thus of little significance. Of the six digits that actually would create more reason to think the resident of Room 310 was Leconte Oneal, only three digits overlap. Three of the same digits out of six that matter do not make the social security numbers "very similar."

The government also argues that because, when the number on the registration card was "run" through the police database, no "hits" came back, the finger of suspicion pointed to Leconte Oneal. The officers testified that the fact of no "hits" indicated to them that the resident of Room 310 was actually evading detection. This logic had several flaws. One of the digits of the social security number listed on the registration card was difficult to read and was therefore open to interpretation (*see* Dkt. No. 38 at 27). But only one of the possible interpretations was "run" by the officers. Moreover, that the social security number came back with no hits did not necessarily mean the resident of Room 310 was evading detection. That resident could have simply had no arrest record.

*Second*, the government points to the phone number listed on the registration card because it has the same area code — 510 — as the number listed on the rap sheet that the FRET officers had with them (the other numbers were different). This added little. Given today's cell phone mobility, many in San Francisco have East Bay cell phone numbers with the area code 510 and vice versa. That similarity suggested nothing.

*Third*, in passing the government states that the number of months of residency listed on the registration card bolstered probable cause, but it does not state how. As this order need not and cannot come up with an argument concerning why this would support probable cause, the length of residency listed on the registration card will not be considered.

7

*Fourth*, the government asserts that the fact that Officer Castillo knew the defendant from a prior arrest — and on that occasion he lied about his name — bolstered the reliability of the informant's tip. Another way of stating this argument is: the fact that "Marcus Howard" was listed on the registration card actually *supported* the notion that Leconte Oneal was residing in Room 310, because he was not someone who would provide his real name. Such logic would support a finding of probable cause for *any* room regardless of who was listed as the resident. This goes too far.

*Fifth*, and most significantly, the day, month, and year of the birth date listed on the registration card for the individual residing in Room 310 was the same as listed on Leconte Oneal's rap sheet. The year listed on the card was also in the same year said by the CI to be Leconte Oneal's year of birth.

As stated, the question here is whether the reliability of the CI's tip was "demonstrated through independent police corroboration of the information provided." *United States v. Bishop*, 264 F.3d 919, 925 (9th Cir. 2001). On its own, the tip was not enough to create probable cause that Room 310 was Leconte Oneal's residence. On its own, the fact that the birth date, month, and year matched on Oneal's rap sheet and the registration card did not create probable cause. *But together — that is, the informant's information pointing to Room 310 and the rap sheet-registration card birth-date match — they did amount to probable cause.* The matching birth dates corroborated the informant's statement that Leconte Oneal lived in Room 310. The CI's tip was very specific as to Oneal's residence and that he was born in 1973. The matching birth dates therefore corroborated the tip in two ways: *First*, the match confirmed the informant's statement that Oneal was born in 1973. *Second*, the match corroborated the informant's statement that Room 310 was Oneal's residence. The question is not whether any of these facts standing alone would have been enough to create probable cause, but rather whether the informant's tip plus the corroboration supplied probable cause. It did.

Counsel have provided no decisions of the Ninth Circuit or elsewhere that require a different result. Perhaps there is no decision on point. So we are left to fall back on general

8

principles. The Court's best reading of the case law in our circuit falls on the side of finding probable cause in these circumstances.

It is true that the police used exceedingly faulty logic on other aspects of the probable cause inquiry. Again, for example, the fact that the social security number came back with no hits was in no way an indication that the occupant of the room was "evading detection." It is easy to get caught up in this fallacy and to throw the baby out with the bath water. On more considered reflection, the two items mentioned above — namely, the specific call out of Room 310 by the tipster plus the specific match-up of the date, month, and year as between the rap sheet and the registration card (not to mention that the tipster further stated Oneal was born in the same year) — supplied probable cause irrespective of the lapses in logic by the officers on other particulars. Because of this finding, this order need not consider the government's alternative inevitable-discovery argument.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress is **DENIED**. The parties shall appear for a status conference on **OCTOBER 26, 2010, AT 2:00 P.M.**

**IT IS SO ORDERED.**

Dated: October 13, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9